Filed 2/13/24  In re A.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.R. et al.,<br><br>Defendants and Appellants. | F086522<br><br>(Super. Ct. No. 22CEJ300055)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Kimberly Nystrom-Geist, Judge.

Liana Serobian, under appointment by the Court of Appeal, for M.R. Defendant and Appellant.

Patricia K. Saucer, under appointment by the Court of Appeal, for Andre A. Defendant and Appellant.

---

[*]    Before Franson, Acting P. J., Peña, J. and Smith, J.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

M.R. (mother) and Andre A. (father) bring this appeal following a contested Welfare and Institutions Code[1] section 366.26 hearing, at which time their parental rights were terminated, and a permanent plan of adoption was selected for their son, A.A. The sole issue raised by mother in this appeal is the juvenile court's finding of detriment resulting in the termination of her right to visitation in December 2022, arguing it was not supported by substantial evidence and prevented her from establishing the parental-benefit exception to adoption. Father's appeal simply states that if mother's appeal is successful, the termination of his parental rights should be reversed as well. We affirm the findings and orders entered by the juvenile court following the section 366.26 hearing.

## PROCEDURAL AND FACTUAL SUMMARY

This procedural and factual summary is largely taken from the opinion issued by this court on March 6, 2023, in case No. F085390, in response to a writ petition brought by mother challenging the findings of the juvenile court at the end of a contested jurisdiction/disposition hearing. That contested hearing found A.A. to be a dependent of the court, denied mother and father reunification services, and set a section 366.26 hearing to consider a permanent plan. (*M.R. v. Superior Court* (Mar. 6, 2023, F085390) [nonpub. opn.] (*M.R.*).)

"*A.    The Referral*

"On February 18, 2022, mother took then three-month-old A.A. to the emergency room because he was crying and vomiting. A brain scan revealed bilateral subdural fluid collections. A bone survey revealed an acute transverse fracture of the mid left humeral

---

[1]    All further statutory references are to the Welfare and Institutions Code.

2.

diaphysis, acute metaphyseal corner fractures of the left distal tibia and fibula, a healing subacute metaphyseal corner fracture of the right distal tibia, healing left lateral sixth and seventh rib fractures with callous formation, even older more healed fractures of the left lateral second rib and left lateral eighth rib and a possible nondisplaced acute right lateral seventh rib fracture. The rib fractures were estimated to be about two weeks old. A.A. also had slight bruising on his chest and his liver enzymes were elevated, consistent with A.A. having experienced some kind of trauma. He also had moderate intraretinal hemorrhaging consistent with repetitive head motion trauma, also known as shaken baby syndrome. Neither parent had an explanation for A.A.'s injuries. A.A. was admitted to the hospital and underwent neurosurgery to drain the fluid on his brain.

"Dr. Jessica Daly, the child advocacy attending physician, opined A.A.'s injuries were not consistent with a medical explanation and were very likely the result of nonaccidental trauma.

"G.R., the maternal grandmother, contacted the hospital staff and reported that A.A. had marks on his body in the past and that father had been behaving strangely recently. A.A. began daycare on February 15, 2022. Two days later, G.R. noticed bruising on his chest. When she confronted mother about the bruising, mother denied knowing about it. Father stated the doctors checked him and did not find anything. A.A. was also evaluated at the hospital on December 27, 2021, for marks on his arms and legs, which was diagnosed as a rash. On December 29, 2021, he was taken to the hospital and diagnosed with respiratory syncytial virus (RSV). G.R. did not believe A.A. had a rash because the marks looked like bruising. G.R. is a surgical assistant and could tell it was not a rash. She noticed bruising on A.A. early in his life and told mother to take him to the hospital. She asked father what happened, and he would not make eye contact with her and appeared angry. He hit his hands on the car and shook it. She said father smoked marijuana and drank alcohol frequently and was not allowed in her house if he was under the influence.

3.

"Mother said she had no known medical conditions that would account for A.A.'s injuries. He had markings on his body on December 27, 2021, which was determined to be a rash from RSV. He was diagnosed with RSV two days later. She said the rash looked like purple and red dots, which the doctor attributed to him being sick and to a lotion she was putting on him. When she stopped applying the lotion, the rash disappeared. She took A.A. to the doctor on February 16, 2022, because he had a temperature of 103 degrees. The parents were instructed to administer a suppository laxative for constipation and probiotics. Mother gave A.A. a different medication and his condition did not improve. The following day, they were at G.R.'s house and she helped father administer the suppository which appeared to provide A.A. relief. A.A. was no longer fussy but was spitting up. G.R. noticed that A.A. had bruising on his chest when changing him. The bruise was yellow and ran under his left nipple. Mother did not know what caused the bruising.

"Mother could not remember any incident which could have caused A.A.'s injuries. She denied harming him and did not suspect anyone of harming him. She was always with him unless she was at work. She resumed work on February 15, 2022, and A.A. was placed in an in-home daycare with a woman who also provided daycare for mother's nephew. She left A.A. with G.R. overnight on three to four occasions. After mother returned to work, father cared for A.A. until mother returned from work on those days when A.A. was not in daycare.

"Mother reported she and father were married in August 2021. They had a healthy relationship and there was no domestic violence. They argued but it was never physical, and they did not shout at each other. A.A. was a good child and never cried until he became sick with RSV. Father loved A.A. and did not appear to get frustrated with him. Mother denied any substance abuse, mental health problems or criminal history.

"Father reported mother was A.A.'s primary caregiver and A.A. went to daycare on Tuesday, Wednesday, and Thursday. He did not know how A.A. was injured and did

4.

not witness anyone harm him. A.A. did not fall and was not harmed by the family dogs. Mother did not have postpartum depression and was not overwhelmed by A.A. Father denied having any mental health problems or using any controlled substances or alcohol. The last time he used marijuana was when he was a teenager. He and mother did not engage in domestic violence. He worked full time Monday through Friday and sometimes on the weekend.

"On February 20, 2022, the [Fresno County Department of Social Services (department)] served a protective warrant and detained A.A. at the hospital. The following day, a social worker and police officer met with father. He said he believed the family dog knocked A.A. out of his swing. He was home alone with A.A. and mother was at work. A.A. was not properly restrained in the swing and the dogs were running around the house. One of the dogs knocked the swing as it ran by. Father did not witness the swing fall but heard a loud thud and saw A.A. lying face down on his left arm and crying. He then saw the dog run past A.A. He picked A.A. up to console him and put the dogs away. He did not tell mother because he was afraid she would make him get rid of the dog. A.A. did not cry throughout the day so he thought he was okay. He did not think to share the incident about the swing when he was questioned by the social worker and the police and apologized for lying about smoking marijuana and drinking alcohol. He said he drank alcohol on occasion and smoked marijuana but not daily. He denied being under the influence while caring for A.A. and when A.A. fell from the swing. He then stated he wondered if A.A. was injured because he swaddled him too tightly or if the nurses were too rough with him.

"Social worker Gayane Petrosyan notified the parents about a team decision making meeting (TDM) scheduled for February 23, 2022. Mother asked for advice on how she should handle herself and how she could 'back herself up' and how she could back father up since she was not at home when A.A. fell. Petrosyan encouraged them to be honest. She visited the family home and found it clean with no safety hazards. She

5.

observed A.A.'s swing and estimated it was approximately a foot and a half above the ground when fully operating.

"On February 22, 2022, Dr. Daly stated that she ordered extra X-rays of A.A. because the original bone scan did not include his hands or feet. The new X-rays revealed a fracture of the left foot between the fourth and fifth metatarsals. Dr. Daly also noticed a subtle bruise on A.A.'s left hip that had not been documented by the other doctors. The accumulation of fluid and blood in A.A.'s head was indicative of chronic trauma and was so significant that it caused his head to appear larger than normal. Mother claimed A.A.'s head had always been large and showed Dr. Daly a picture taken some time before. Dr. Daly perceived A.A.'s head as looking normal in the picture. Because of the fluid accumulation in A.A.'s brain, his brain matter was only approximately 60 percent of what it should be and could portend possible developmental delay. A.A.'s brain was able to expand within his skull because his fontanelles were not fused. Had they been fused; he could have died from the brain swelling. Even though A.A. did not die, he could have.

"Neither parent presented any new information or explanation for A.A.'s injuries at the TDM on February 23, 2022. However, later that day father asked to speak to Petrosyan and a detective. He said he may be the reason A.A. sustained rib fractures and wanted to 'get it off [of] his chest.' He admitted getting frustrated with A.A., grabbing him by both sides of his ribs and shaking him. It happened two or three times while changing A.A. Father grabbed him by the ankles too hard and pulled him aggressively toward him. He did not always change A.A.'s diaper in this aggressive manner but did approximately 10 times. When he did, it startled A.A., and he cried. When A.A. cried, father put him on his chest to comfort him and put pressure on his ribs by squeezing too hard. If A.A. did not stop crying, he shook him. He denied shaking him back and forth, causing his head to wobble. Instead, he demonstrated using a doll how he held A.A. upright around the rib area and shook him by placing pressure on his ribs as if the baby

was vibrating all over.  He did admit rocking A.A.'s car seat aggressively and in a fast manner while in the car if A.A. cried.  He rocked the car seat to the point that A.A.'s head flopped back and forth and from side to side.  He did not know how A.A. sustained the bruising and never noticed his head looked different.  He was last aggressive with A.A. during the week of February 14, 2022.  He was alone with A.A. on Tuesday and Wednesday.  He shook A.A. the way he demonstrated.

"*B.      The Initial Proceedings*

"On February 23, 2022, the department filed a first amended dependency petition, alleging A.A. came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (e) (severe physical abuse) and (i) (cruelty) based on the nonaccidental nature of the injuries he sustained, which it detailed, while in the care of his parents.

"The juvenile court made temporary orders removing A.A. from his parents at the initial detention hearing on February 24, 2022, and continued the hearing to February 28, 2022.  On February 28, the court ordered A.A. detained, offered the parents random drug testing, ordered reasonable supervised visitation, and set the jurisdiction and disposition hearing for April 6, 2022.  The department placed A.A. with his maternal grandparents.

"The jurisdiction/disposition hearing was continued to April 13, 2022.  In its report for the hearing prepared in April 2022, the department recommended the juvenile court sustain the allegations and deny the parents reunification services under section 361.5, subdivision (b)(5) and (6).  Mother [reported she] observed father shake A.A. in his car seat but denied that he did it aggressively.  She removed A.A. from father if she saw he was mad, frustrated, or aggressive with A.A.  She and father were still married but no longer living together.  They spoke over the phone about A.A. and visited him together.

"On April 13, 2022, the juvenile court set the matter as a contested hearing, which was continued and [finally] conducted as a contested hearing on December 6, 2022.

Meanwhile, the department filed an addendum report, reiterating its recommendation to deny services and informing the juvenile court the parents completed classes in parenting and anger management. They enrolled in random drug testing in March 2022. Father tested positive twice for THC and mother for creatinine.

"C.    *The Jurisdiction and Disposition Hearing:  December 6, 2022*

"Social worker Ashley Holmes testified she interviewed G.R. about her time spent with A.A. but did not investigate any other people who mother identified as having contact with A.A. She did not speak with A.A.'s pediatrician. Mother asked her what services she recommended and Holmes recommended parenting, domestic violence, mental health, substance abuse and testing. The parenting class was free, but the others required payment and some like the child abuse class required a referral from the department. Mother attempted to enroll in a child abuse class but was unable because she did not have a referral. Holmes believed the department was paying for mother to participate in random drug testing. Sometime around May 2022, mother told her she was living with her maternal grandmother. However, the department was concerned she and father had ongoing contact. The department received several reports they were living together, and they were seen together in public. Holmes did not take any steps to determine whether they were living together. In addition, they arrived together for visits with A.A.

"Mother testified she was home taking care of A.A. from his birth in November 2021 until she returned to work on February 15, 2022. Father returned to work in December 2021. Her mother (G.R.) and sister came to their home after father returned to work. Starting in December 2021, she allowed A.A. to stay overnight with G.R. Her father, 22-year-old sister, 20- to 21-year-old brother-in-law, 16-year-old brother, and one-year-old nephew also lived in the home. She continued to allow G.R. to care for A.A. overnight in January 2022. She took A.A. to the hospital on February 18, 2022, because he was not drinking his milk and was spitting it up. A week later, father

8.

told her that A.A. fell out of his swing on February 16, 2022. Mother did not observe any bruises on A.A. on that day. Asked whether she had any reason to believe that father caused A.A.'s injuries, she stated, 'They did tell me that there was evidence to support his injuries.' She had never personally observed father injure A.A. and she did not know how he was injured.

"Mother completed a 12-week parenting class and 12 weeks of anger management and continued to attend anger management classes. She paid for the classes as well as the drug testing. She also attended two sessions of individual mental health therapy. She attempted to enroll in a child neglect and domestic violence class but did not have the required referrals. Mother moved in with her grandparents in early May 2022 and was committed to remaining separate from father.

"On cross-examination, mother denied ever witnessing father exhibit any behavior while caring for A.A., including frustration, that concerned her or caused her to take A.A. from him. Despite knowing that father explained ways in which he may have harmed A.A., mother still denied knowing how A.A. received his injuries.

"During argument, mother's attorney argued mother did not injure A.A. or know that he had been injured and asked the juvenile court to dismiss the section 300, subdivisions (e) and (i) counts and provide her reunification services. She also pointed out that mother separated from father and engaged in services on her own. Father's attorney objected to the department's recommendations and asked the court to provide him reunification services.

"D.  *The Juvenile Court's Ruling*

"The juvenile court found true the allegations in the dependency petition and adjudged A.A. a child described under section 300, subdivisions (a), (b)(1), (e) and (i). The court also ordered A.A. removed from parental custody, denied the parents reunification services under section 361.5, subdivision (b)(5) and (6), found visitation would be detrimental, and set a section 366.26 hearing.

9.

"In ruling, the juvenile court enumerated A.A.'s many injuries, noting they were 'consistent with ongoing physical abuse,' and were 'in various stages of healing, each of which would be painful to the child.' The court also noted that A.A. had persistent developmental delays. 'Any reference to [daycare was] simply a red herring on the parents' part in an attempt to draw attention away from the reality that the parents were the ones who had the exclusive care of [A.A.].' The court found that father admitted causing the injuries, yet mother maintained she did not know 'of anyone who would have harmed her child.' The court found her testimony 'completely unbelievable on every issue that was relevant to jurisdiction.' The court stated, 'I did not believe that the mother had no knowledge of how [A.A.'s] injuries were sustained. I did not believe that the mother had any belief that [A.A.] fell from a swing. That appeared by her entire demeanor to be completely fabricated.'

"Regarding the denial of reunification services, the juvenile court noted that while father was perhaps the more likely perpetrator of A.A.'s injuries, 'there is no evidence that exonerates the mother.' Rather, '[t]here is evidence that she must have known that [A.A.] … was having his bones broken over a period of time, that his brain was bleeding' and took no action to protect him even if she had no part in it. The court continued, '[Mother] was aware that [father] was frustrated and she had to take [A.A.] from [him]. The parents do not have credibility. It is unclear whether they are or are not continuing a relationship. … Whether that is permanent, temporary or true, the [c]ourt cannot know.' The court also found there was no evidence that A.A. was closely and positively attached to his parents."

*E.*     *The Writ Petition Filed by Mother*[2]

In her petition filed with this court, mother listed the following issues to be addressed:

> "1.  Was there clear and convincing evidence to support a finding that Petitioner <u>deliberately</u> harmed or <u>consented</u> to <u>deliberate</u> harm of Minor?
>
> "2.  Did the juvenile court err in finding that the court was not permitted to offer reunification services pursuant to WIC § 361.5?
>
> "3.  Did the juvenile court err in denying any reunification services to Petitioner?
>
> "4.  Did the juvenile court err in finding it was not in the Minor's best interest to reunify with Petitioner?"  (*M.R.*, *supra*, F085390, fn. omitted.)

After a responsive brief was filed on behalf of the department, this court issued its opinion on March 6, 2023, finding no error by the juvenile court and denying the petition requesting an extraordinary writ and a stay of proceedings. This court specifically concluded the evidence supported each of the findings challenged by mother in her petition.

 *F.*     *Proceedings Following the Writ Petition*

After the entry of the order setting the section 366.26 hearing, mother filed at least two section 388 petitions with the juvenile court seeking a change in the custody order for A.A.  In these petitions, mother alleged her parents were not appropriate caretakers for A.A., and that A.A. should be provided a new placement.  Both petitions were denied by the court without a hearing.

Also during this time, additional information was provided to the department suggesting A.A. might qualify as a Native American child under ICWA.  After most of the ICWA notices sent out received negative responses, and while the court was awaiting

---

**2**     The docket in case No. F085390 does not include any petition filed on behalf of father challenging any part of the order entered by the juvenile court following the December 6, 2022, jurisdiction/disposition hearing.

11.

one final response, father admitted during the section 366.26 hearing that he was mistaken and that A.A. did not have Native American ancestry.

On June 27, 2023, the section 366.26 contested hearing was held. Although mother initially asked for a contested hearing on the potential termination of her parental rights, and submitted a list of contested issues, no testimony was provided by any party during the hearing. At the end of the hearing, an order was entered stating A.A. would remain a dependent of the court, the parental rights of mother and father were terminated, and that A.A. would be placed for adoption.

## DISCUSSION

While separate notices of appeal were filed on behalf of mother and father following the termination of their parental rights, the only issue raised by mother involves a prior court ruling terminating both parent's ability to participate in visits with A.A. Father simply states in his opening brief that if the ruling terminating mother's parental rights is reversed, it should be reversed for him as well.

## I.    Mother Forfeited the Issues Surrounding the Termination of Her Right to Visitation

Pursuant to section 395, subdivision (a)(1), "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." The exception to this rule involves orders entered following a hearing at which time the court has determined there is a need to set a section 366.26 hearing. Therefore, an order following a dispositional hearing setting a future hearing under section 366.26 is not appealable unless:

"(A)  A petition for extraordinary writ review was filed in a timely manner.

"(B)  The petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record.

"(C)  The petition for extraordinary writ review was summarily denied or otherwise not decided on the merits."  (§ 366.26, subd. (*l*)(1).)

12.

Furthermore, the failure "to file a petition for extraordinary writ review within the period specified by rule, to substantively address the specific issues challenged, or to support that challenge by an adequate record shall preclude subsequent review by appeal of the findings and orders made pursuant to this section." (§ 366.26, subd. (*l*)(2).) If a proper writ petition is then filed by an appellant, any subsequent review on appeal will be limited to the issues raised in that petition. (Cal. Rules of Ct., rule 5.695(f)(8).)

A petition for an extraordinary writ asking this court to review the decision of the juvenile court to set a section 366.26 hearing was filed on behalf of mother on January 17, 2023.[3] (*M.R.*, *supra*, F085390.) However, the petition only challenged (1) the sufficiency of evidence supporting the finding that clear and convincing evidence showed mother either deliberately harmed or consented to the deliberate harm of A.A., (2) the court's conclusion it would not provide reunification services under section 361.5, (3) the court's denial of any reunification services to mother, or (4) the court's determination that it was not in A.A.'s best interest to reunify with mother.[4] (*M.R.*, *supra*, F085390.) The writ petition never argued the court's order terminating visitation with A.A. constituted error as a matter of law or was not supported by the record.

Mother attempts to avoid the question of forfeiture by arguing the denial of visitation before the section 366.26 hearing resulted in a due process violation of her right to contest the termination of her parental rights. In fact, mother did not challenge the issue of visitation before this appeal. The record shows no such challenge raised in either the writ petition filed with this court, or through a section 388 petition for modification of

---

[3]    The petition was submitted for filing on January 13, 2023, but was filed by this court on January 17, 2023.

[4]    This court summarized mother's argument as, "the juvenile court erred in denying her reunification services under section 361.5, subdivision (b)(5) and (6) because there was insufficient evidence to support a finding A.A. suffered severe physical abuse under section 300, subdivision (e) either because she inflicted it upon him or knew or reasonably should have known that father did." (*M.R.*, *supra*, F085390.)

13.

a court order between the December 6, 2022 contested jurisdiction/disposition hearing and the June 27, 2023 section 366.26 hearing on the proposed permanent plan.

Other than relying on the statutory language suggesting the possibility of establishing a beneficial parental relationship, mother provides no authority to support her position. Mother has failed to address why she is now entitled to regular visits with her child after it was already determined a continuation of such visits after December 6, 2022, would be detrimental to A.A. If mother felt that ruling was incorrect, she was required to raise a challenge as early as possible, specifically through the writ. (§ 366.26, subd. (*l*)(1)(2).)

The rule stating a party forfeits an issue that is not properly preserved also applies in dependency cases. (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.) As a result, the finding that visits between A.A. and mother and father would be detrimental to his best interest was not preserved for purposes of this appeal and is now considered forfeited.

## DISPOSITION

The orders entered on June 27, 2023 are affirmed.

14.